IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CINEMAVAULT, INC.,<br><br>    Plaintiff,<br><br> v.<br><br>GAMESHOW NETWORK, LLC,<br><br>    Defendant. | CIVIL ACTION<br>NO. 23-00032 |

## OPINION

**Slomsky, J.**                        **March 17, 2026**

### TABLE OF CONTENTS

I.  **INTRODUCTION** ........................................................................................................... 3

II.  **BACKGROUND** .......................................................................................................... 4

 A. Factual Background ................................................................................................ 4

  1. Plaintiff Cinemavault, Inc. and the Cinemavault Group ................................................. 4

  2. Application of Plaintiff's Predecessor's to Register

   the CINEMAVAULT.COM Trademark ........................................................................... 5

  3. Sale of Plaintiff's Distribution Rights to Avogrado Inc. and Plaintiff's

   Plans for Streaming Services ......................................................................................... 6

  4. Defendant's Registration of the CINEVAULT Trademark ........................................... 6

 B. Procedural Background ......................................................................................... 9

III. **STANDARD OF REVIEW** ...................................................................................... 10

IV. **ANALYSIS** ................................................................................................................ 11

 A. Unfair Competition under the Lanham Act ....................................................... 11

1. Ownership of the CINEMAVAULT Trademark and Continuous Use of the Trademark ............................................................................................. 12

2. Judicial Estoppel ................................................................................................. 18

3. Likelihood of Confusion under the *Lapp* Factors ........................................... 24

   a.   Degree of Similarity............................................................................... 25

   b.   Strength of Owner's Mark .................................................................... 27

      i.   Distinctiveness or Conceptual Strength ................................... 28

      ii.  Commercial Strength or Recognition in the Marketplace ....................................... 30

   c.   Evidence of Actual Confusion ............................................................. 32

   d.   Whether the Parties' Goods are Manufactured through the Same Channels of Trade .............................................................................. 33

V.    **CONCLUSION** .......................................................................................... 35

## I.    INTRODUCTION

What's in a name? That which we call a rose by any other name would smell as sweet.[1]  Not lost on Shakespeare, nor on the parties in this action, is that a name may hold a special meaning. For this reason, this case can be distilled into one question: who holds the rights to a name? Plaintiff Cinemavault, Inc. ("Plaintiff") acquires rights to films and distributes them to the public.  Defendant Gameshow Network, LLC ("Defendant") is a subsidiary of parent company Sony Pictures Television.  Here, Plaintiff alleges that Defendant's trademark, CINEVAULT, infringes upon its own trademark, CINEMAVAULT, in violation of a federal law known as the Lanham Act.[2]  (Doc. No. 1.)

The best way to describe the trademarks is to display them in a picture showing how they are used by the parties—after all, a picture is worth a thousand words.  Below is the CINEMAVAULT mark[3] Plaintiff uses in connection with its film acquisition and distribution business:



(Doc. No. 109 ¶ 13, Doc. No. 124 ¶, 62.)

Defendant's CINEVAULT mark, pictured below, is used in connection with its streaming service:

---

[1]  WILLIAM SHAKESPEARE, ROMEO AND JULIET act 2, sc. 2.

[2]  Trademark infringement under the Lanham Act is referred to in the statute as Unfair Competition.  See 15 U.S.C. § 1125(a)(1)(A).

[3]  For the purposes of this Opinion, "mark" refers to trademark.



(Doc. No. 109 ¶ 62, Doc. No. 124 ¶ 62.)

Before the Court now is Defendant's Motion for Summary Judgment.  (Doc. No. 107.)  In the Motion, Defendant argues summary judgment should be granted in its favor for three reasons: (1) Plaintiff failed to continuously use its CINEMAVAULT trademark;   (2) Plaintiff is judicially estopped from bringing a likelihood of confusion claim;   and (3) the relevant <u>Lapp</u> factors nonetheless preclude Plaintiff from establishing a likelihood of confusion between the two marks at issue.  For the reasons discussed below, Defendant's Motion for Summary Judgment (Doc. No. 107) will be denied.

## II.    BACKGROUND

### A.  Factual Background

The following relevant facts of record are taken from Defendant's Statement of Undisputed Facts (Doc. No. 109) and Plaintiff's Responsive Statement of Facts (Doc. No. 124) and are undisputed unless otherwise noted.

### 1.  Plaintiff Cinemavault, Inc. and the Cinemavault Group

Plaintiff Cinemavault, Inc., organized on January 27, 2014 as a Florida Corporation, is in the business of acquiring rights to feature films and delivering them to the public in two ways—directly by streaming content or indirectly by sub-distribution agreements.  (Doc. No. 124 ¶¶ 2, 87.)  Plaintiff is one of several entities within a larger corporate group, Cinemavault Group. (Doc. No. 109 ¶ 3, Doc. No. 124 ¶ 3).  Plaintiff maintains that the Cinemavault Group has used the CINEMAVAULT logo, as depicted below, on DVDs, marketing materials, and on film credit frames.  (Doc. No. 109 ¶ 13, Doc. No. 124 ¶ 13.)

 

(Id.)

### 2. Application of Plaintiff's Predecessor's to Register the CINEMAVAULT.COM Trademark

In 2000, Plaintiff Cinemavault, Inc. had a predecessor with a similar name, Cinemavault.com ("Plaintiff's Predecessor").  (Doc. No. 124 ¶ 89.)  On February 22, 2000, Plaintiff's Predecessor filed a trademark application for the mark, CINEMAVAULT.COM.  (Id.)  During the registration process, the United States Patent and Trademark Office ("USPTO") found an earlier application for the mark CINEVAULT, which was applied for by a third-party not involved in this litigation named Video Lending of North America, Inc. ("Video Lending").  (Doc. No. 109 ¶ 24, Doc. No. 124 ¶ 24.)  This earlier application by Video Lending described its business as providing services for "computerized video rental machines" and "computerized video rental services."  (Id. ¶ 91.)

When Plaintiff's Predecessor submitted its application for the trademark CINEMAVAULT.COM, Plaintiff's Predecessor stated that its mark would cover services for "[o]n-line retail store services featuring toys, cups, mugs, keychains, stickers, posters, jewelry, collectibles, novelties, gifts, accessories, souvenirs, clothing, hats, caps, shirts, sweaters, sweatshirts, sweatpants, pajamas, jackets, pants, shorts, and socks all featuring characters, themes, or titles associated with motion pictures…" (Id. ¶ 92.)  In addition, Plaintiff's Predecessor also noted in its application that it provided services for "[d]istribution of motion pictures for dissemination by electronic communications networks; obtaining copyright clearance rights to motion pictures and films for television stations, retailers and businesses by

5

our global computer information network." (Id.)  Streaming of movies and other content did not exist over twenty years ago.

Plaintiff's Predecessor began using the mark CINEMAVAULT.COM on September 1, 2000.  (Id. ¶ 108.)  Registration of this trademark was completed on December 6, 2005.  (Id. ¶ 108a.)  The registration of CINEMAVAULT.COM remained in effect until 2012, when the registration lapsed.[4]  (Doc. No. 108 ¶ 32, Doc. No. 124 ¶ 32.)

### 3.  Sale of Plaintiff's Distribution Rights to Avogrado Inc. and Plaintiff's Plans for Streaming Services

In April 2017, Vaultco—another entity within the Cinemavault Group—sold its catalog of film distribution rights to Avogrado Inc., a Bahamian corporation, pursuant to a Film Transfer Rights Agreement.  (Doc. No. 109 ¶ 44, Doc. No. 124 ¶ 44.)[5]  Also around this time, at some point between 2016 and 2017, Plaintiff decided to cease licensing its film catalog to third-party distributors in order to accumulate content for its own streaming platform.  (Doc. No. 124 ¶ 132.)

On February 4, 2019, Avogrado subsequently assigned the rights it had originally acquired from Vaultco to an entity called Future Films, which is part of the larger Cinemavault Group.  (Doc. No. 124 ¶ 135.)  Plaintiff maintains this assignment shows its use of the CINEMAVAULT mark after February 4, 2019.  (Doc. No. 124 ¶ 137.)

### 4.  Defendant's Registration of the CINEVAULT Trademark

In October 2020, Bob Pederson, Defendant Game Show Network LLC's Senior Vice President for Brand Creative, proposed CINEVAULT as a potential name for Defendant's suite

---

[4]    Plaintiff highlights that the lapse in registration was inadvertent.  (Doc. No. 124 at 8.)

[5]    Defendant also contends that because Vaultco, on behalf of the Cinemavault Group, sold all film distribution rights in their catalogue in April 2017, Plaintiff would not have used the CINEMAVAULT mark at the very least by that date.  (Doc. No. 108 at 9.)

of free ad-supported streaming television ("FAST") channels featuring classic films. (Doc. No. 109 ¶ 57, Doc. No. 124 ¶ 57.) Pederson proposed the name CINEVAULT because it connotes the nature of Defendant's FAST channel. (Id.) That same month, at Defendant's request, outside counsel conducted a preliminary and then a comprehensive trademark clearance search for the CINEVAULT mark for use in connection with Defendant's proposed FAST channel. (Doc. No. 109 ¶ 58, Doc. No. 125 ¶ 58.) According to Defendant, neither search yielded material risks to the use or registration of the CINEVAULT mark. (Id.) As it relates to CINEMAVAULT, the searches conducted by Defendant's outside counsel revealed (1) non-party Cinemavault.com Inc.'s expired registration of the CINEMAVAULT.COM logo and (2) a website named cinemavault.com.[6] (Doc. No. 109, ¶59, Doc. No. 124, ¶ 59.) With this information, Defendant decided to move forward with CINEVAULT as the brand name for its FAST channels. (Doc. No. 109 ¶ 60, Doc. No. 124 ¶ 60.)

On November 20, 2020, Defendant filed an application to register its intent to use the trademark CINEVAULT with the USPTO, which matured to registration[7] on March 1, 2022 for

---

[6]  Plaintiff disputes the results of the latter search to the extent that it is incomplete because the prior registration form listed the names of Plaintiff's counsel and, although the website was "under maintenance," it was available upon request to consumers familiar with Plaintiff. (Doc. No. 124 at 9.) The website could be accessed through the URL https://cinemavault.com/. As of February 25, 2026, the "under maintenance" message was not displayed on the website.

[7]  To successfully register a trademark, the applicant seeking to register the mark must meet all legal requirements and deadlines and pay the necessary fees mandated by the USPTO. See *Timelines for the trademark application and post-registration process*, USPTO, https://www.uspto.gov/trademarks/trademark-timelines/trademark-application-and-post-registration-process-timelines (last visited Feb. 12, 2026). Upon successful registration of a trademark, there are subsequent requirements set forth by the USPTO to keep the registration alive. See *Keeping your registration alive*, USPTO, https://www.uspto.gov/trademarks/maintain/keeping-your-registration-alive (last visited Feb. 18, 2026).

"[t]ransmission and distribution of data or audio visual images via a global computer network or the internet" and "[e]ntertainment services in the nature of free ad-supported television programming featuring classic motion pictures." (Doc. No. 109, ¶ 61, Doc. No. 124 ¶ 61.) On March 19, 2021, Defendant filed an application to register the CINEVAULT trademark, depicted below, with the USPTO which matured to registration on March 29, 2022 for "[t]elevision transmission services being transmission and distribution of free ad-supported online television channels" and "[e]ntertainment services in the nature of providing free ad-supported non-downloadable films and television programs via free online television channels." (Doc. No. 109 ¶ 62, Doc. No. 124 ¶ 62.)



(Id.) No proceeding was instituted opposing the registration of either of Defendant's applications. (Doc. No. 109 ¶ 63, Doc. No. 124 ¶ 63.)

In February 2021, Defendant began offering its FAST channels under the CINEVAULT trademark. (Doc. No. 109 ¶ 65, Doc. No. 124 ¶ 65.) Defendant's FAST channels are streamed to consumers via streaming television platforms, like Roku, Samsung TV Plus, and Vizio. (Doc. No. 109 ¶ 66, Doc. No. 124 ¶ 66.) Defendant offers three channels: CINEVAULT, CINEVAULT CLASSICS, and CINEVAULT WESTERNS. (Doc. No. 109 ¶ 67, Doc. No. 124 ¶ 67.) Defendant markets CINEVAULT to customers in the United States who watch television and use one of the streaming platforms through which CINEVAULT is distributed. (Doc. No. 109 ¶ 68, Doc. No. 124 ¶ 68.) Defendant's channels do not offer films on demand, but instead the films are streamed live. (Doc. No. 109 ¶ 69, Doc. No. 124 ¶ 69.)

Finally, in December 2024, Plaintiff launched its own streaming service which is available on cinemavault.com and also downloadable app to access the streaming service. (Doc. No. 109 ¶ 74, Doc. No. 124 ¶ 74.)

## B. Procedural Background

On January 12, 2023, Plaintiff initiated this action against Defendant for Unfair Competition under the Lanham Act and common law trademark infringement and unfair competition. (Doc. No. 1.) On March 20, 2023, Defendant filed its Answer. (Doc. No. 7.) And, on July 30, 2025, following extensive fact discovery, Defendant moved for Summary Judgment. (Doc. No. 107.) On September 26, 2025, Plaintiff filed its Response in Opposition (Doc. No. 123.) On October 17, 2025, Defendant filed a Reply. (Doc. No. 131.) On November 5, 2025, this Court held a hearing on the Motion for Summary Judgment. (Doc. No. 143.) At the hearing, the Court granted Plaintiff leave to file a Supplemental Memorandum in Opposition to the Motion for Summary Judgment and for Defendant to file a Response. (Doc. No. 145.) Supplemental Memoranda were filed by the parties (Doc. Nos. 151, 153.) The Motion for Summary Judgment is now ripe for disposition.[8]

---

[8]  On February 6, 2026, Plaintiff filed a letter with the Court expressing concern that the words of two of its witnesses, Steve Arroyave and Nick Stiliadis, were being mischaracterized in Defendant's Response. (Doc. No. 159.) Along with the letter, Plaintiff submitted additional documentation to prevent "misinterpretation" of what was said by Arroyave and Stiliadis. (Id.) On February 19, 2026, Defendant filed its own Letter seeking to have Plaintiff's letter stricken form the record because it was untimely filed and, in any event, considering its content, raised futile matters. (Doc. No. 161.) Plaintiff's submission, however, is untimely, as the Court only granted leave for Plaintiff to submit a Supplemental Memorandum in Opposition by December 5, 2025—more than two months prior to the filing of the letter. (Doc. No. 150.) Moreover, the documentation provided by Plaintiff is being submitted outside the scope of the discovery deadline. For these reasons, the Court will not consider Plaintiff's Letter (Doc. No. 159) in rendering a decision on the Motion for Summary Judgment. (Doc. No. 107.)

### III.    STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In reaching this decision, the Court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Hart v. Elec. Arts, Inc., 717 F.3d 141, 148 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010)).  "A dispute 'is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.'" Moody v. Atl. City Bd. of Educ., 870 F.3d 206, 213 (3d Cir. 2017) (citing Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006)).  A disputed fact "is material only if it might affect the outcome of the suit under governing law." Id.  Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Meditz v. City of Newark, 658 F.3d 364, 369 (3d Cir. 2011) (quoting Azur, 601 F.3d at 216).  "The moving party is entitled to judgment as a matter of law when the non-moving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof.'" Range v. AG United States, 53 F.4th 262, 269 (3d Cir. 2022) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried.  Anderson, 477 U.S. at 247–

249.  Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the nonmoving party's evidence over that presented by the moving party.  Id. at 255.  If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party.  Id. at 250.

## IV.    ANALYSIS

### A.    Unfair Competition under the Lanham Act

As noted earlier, Defendant argues that summary judgment should be granted in its favor for three reasons:  (1) Plaintiff failed to continuously use its CINEMAVAULT trademark;  (2) Plaintiff is judicially estopped from bringing a likelihood of confusion claim;  and (3) the relevant Lapp factors nonetheless preclude Plaintiff from establishing a likelihood of confusion between the marks at issue.  (Doc. No. 107.)

To establish a claim of unfair competition under the Lanham Act, a party must demonstrate that "(1) the marks are valid and legally protectable; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services."  Chrin Hauling, Inc. v. Chrin, 2023 WL 6985660, at *3 (E.D. Pa. Oct. 23, 2023) (citing Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 291 (3d Cir. 1991)).[9]  However, to establish ownership of an unregistered mark, "the first

---

[9]   In the Complaint, Plaintiff alleges a claim for unfair competition under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), as well as claims for common law trademark infringement under the laws of California and Massachusetts.  (See Doc. No. 1 at 12–13.)  The elements to establish a claim of unfair competition under the Lanham Act are the same as the elements to establish a claim of trademark infringement under the laws of California and Massachusetts.  See United Oil Heat, Inc. v. M.J. Meehan Excavating, Inc., 95 Mass. App. Ct. 579, 581–82 (2019) ("In Massachusetts, the test for common law trademark infringement is the same as under the Lanham Act"); Bose Corp. v. Ejaz, 732 F.3d 17, 26 n.7 (1st Cir. 2013) ("[T]he common law trademark claims in Massachusetts…require the same elements as the federal claim."); Cleary

11

party to adopt a trademark can assert ownership rights, provided it continuously uses it in commerce." Barrolle v. Liberian Sports Ass'n of Pa., No. 11-cv-4518, 2011 WL 3047811, at *4 (E.D. Pa. July 25, 2011) (citing Ford Motor Co. v. Summit Motor Prods., Inc., 930 F. 2d 277, 292 (3d Cir. 1991)).

The Parties agree the CINEMAVAULT mark is valid and legally protectable. However, their dispute hinges on the three arguments that Defendant asserts undermines the claim of Unfair Competition under the Lanham Act. Thus, the Court will focus its analysis on those disputed matters.

### 1. Ownership of the CINEMAVAULT Trademark and Continuous Use of the Trademark

First, Defendant asserts that Plaintiff cannot establish senior trademark rights because it failed to make actual and continuous use of the CINEMAVAULT mark prior to and after November 20, 2020, the date Defendant filed its intent-to-use application to register the CINEVAULT trademark. (Doc. No. 108 at 14–15.) In response, Plaintiff maintains that it has made continuous use of its CINEMAVAULT mark since 2016. (Doc. No. 123.)

As a threshold matter, although the parties agree that Plaintiff claims ownership of an unregistered mark, the Court still needs to discuss the applicable standards to establish ownership of this unregistered mark. The parties agree that the registration of CINEMAVAULT lapsed in 2012. (Doc. No. 108 ¶ 32, Doc. No. 124 ¶ 32.)

Ownership of a trademark comes from use, not registration. Barrolle, 2011 WL 3047811, at *4 (citing A&H Sportswear Co. v. Victoria's Secret Stores, Inc., 967 F. Supp. 1457, 1475 (E.D.

---

v. News Corp., 30 F. 3d 1255, 1262–63 (9th Cir. 1994) ("This Circuit has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act.")

Pa. 1997)).  A party establishes ownership of a mark by being the first to use the mark in commerce.  Id.  Similarly, to establish ownership of unregistered marks, "the first party to adopt a trademark can assert ownership rights, provided it continuously uses it in commerce."  Id. (quoting Ford Motor Co., 930 F.2d at 292).  Under the Lanham Act, "use in commerce" is defined as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark."  15 U.S.C.§ 1127.  Thus, to prevail, a party must show that its prior use of the mark was done "in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." Maduka v. Tropical Naturals, Ltd., 409 F. Supp. 337, 355 (E.D. Pa. 2019) (quoting Lucent Info. Mgmt. v. Lucent Techs., Inc., 186 F.3d 311, 315 (3d Cir. 1999)).  Put differently, "that party must introduce evidence to show its trademark has achieved market penetration that is significant enough to pose the real likelihood of confusion among consumers in that area.'" Id. (quoting Lucent Info Mgmt., 186 F.3d at 317).

To determine whether market penetration in an area is sufficient to warrant protection, courts employ four factors:  (1) volume of sales of the trademarked product; (2) the growth trends, both positive and negative, in the area; (3) the number of people actually purchasing the product in relation to the potential number of customers; and (4) the amount of product advertising in the area.  Id. (citing Natural Footwear, Ltd., v. Hart, Schaffner & Marx, 760 F.2d 1383, 1398–99 (3d Cir. 1985)).  Notably, the volume of sales must be more than de minimis.  Id.; see also Lucent Info. Mgmt.,186 F.3d at 317–18 (concluding a company's use of a trademark was de minimis because there was only a single sale for $323.50 in an entire year); Natural Footwear, Ltd., 760 F.2d at 1400 (finding use of a trademark as de minimis because a company's gross sales neither totaled more than $5,000 nor amounted to more than 50 customers in two of the three years for

13

which sales data was available).  However, so long as "'genuine use of the mark in commerce [exists], …ownership may be established even if the first uses are not extensive and do not result in deep market penetration or widespread recognition.'"  Maduka, 409 F. Supp. at 356 (quoting Allard Enters., v. Advanced Programming Res., Inc., 146 F.3d 350, 358 (6th Cir. 1998)).  Moreover, a single sale or shipment might suffice to demonstrate ownership of the trademark so long as the sale or shipment was "followed by activities which would tend to indicate a continuing effort or intent to continue such use and place the product on the market in a commercial scale."  Id.

In addition, "[t]rademark standards do not traverse international borders."  Kos Pharms., Inc. v. Andrx Corp., 369 F. 3d 700, 714 (3d. Cir. 2004).   "'The concept of territoriality is basic to trademark law; trademark rights exist in each country solely according to that country's statutory scheme.'"  Id. (quoting Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha, 754 F.2d 591, 599 (5th Cir. 1985)).  Thus, foreign trademark use is ineffectual to create trademark rights in the United States.  Maduka, 409 F. Supp. 3d at 357 (quoting Fuji Photo, 754 F.2d at 599).

To begin, here, Defendant avers that the operative date for establishing Plaintiff's priority for the CINEMAVAULT mark is November 20, 2020, as that is the date Defendant filed its intent-to-use application to register the CINEVAULT mark.  (Doc. No. 108 at 15.)  Defendant contends that neither Plaintiff nor any other entity in the Cinemavault Group continually used the CINEMAVAULT mark prior to November 20, 2020 to sufficiently demonstrate market penetration, as required by the Third Circuit.  (Doc. No. 108 at 18.)  In this regard, Defendant first stresses that neither Plaintiff nor any other Cinemavault Group entity made a single sale to individual consumers or businesses between 2017 and 2024.  (Id.)  Defendant also highlights that Plaintiff has not filed any tax returns since 2017 and has "generated negligible revenue."  (Id.)

14

Defendant further argues that Plaintiff failed to use the CINEMAVAULT mark in any advertisements in the United States since 2016. (Id.) And to further illustrate a lack of market penetration, Defendant points out that Plaintiff failed to attend a single film festival between 2016 and 2023. (Id. at 19.) Defendant also highlights that Plaintiff's public-facing website, cinemavault.com, was non-operational from 2016 to 2023 except for a message stating "Stay Tuned. Our website is under maintenance." (Doc. No. 109 ¶¶ 40, 73.) Notably, Defendant maintains that Plaintiff's receipt of royalties in connection with preexisting sub-distribution agreements during the relevant period does not constitute continued use of the mark because such activity is passive. (Doc. No. 108 at 19.) Further, Defendant asserts that any business activities that took place abroad are irrelevant to demonstrate continued use of the CINEMAVAULT mark. (Id. at 20) (relying on Maduka, 409 F. Supp. 3d at 357) ("It is well settled that foreign use is ineffectual to create trademark rights in the United States.")). Finally, Defendant argues that because Vaultco, on behalf of the Cinemavault Group, sold all the film distribution rights in the catalog in April 2017, Plaintiff could not have made use of the CINEMAVAULT mark. (Id.)

Conversely, Plaintiff insists it has made continuous use of the CINEMAVAULT mark prior to November 20, 2020 and even after that date. (See Doc. No. 123.) Plaintiff notes that between 2016 and 2017, not only was its business continuing, but it was actively working to implement a feature film streaming service. (Id. at 14.) Plaintiff summarizes Defendant's position as "if a business is not continually growing, or at least maintaining a current level of sales, it is out of business and loses its trademark rights" and maintains this position is "unsupportable." (Id. at 21.) Instead, to demonstrate continuous use, Plaintiff highlights that (1) in 2016 Plaintiff placed films already acquired into its inventory, (2) in 2021 Plaintiff received royalty payments from

15

fourteen sub-distribution agreements, and (3) in 2023, Plaintiff received royalty payments from nine sub-distribution agreements.  (Id.)  Plaintiff maintains that receipt of royalty payments demonstrates continuous use of the mark, CINEMAVAULT, because it nonetheless shows business activity.  (Id.)  Finally, in the Supplemental Memorandum in Opposition, Plaintiff contends that "films distributed in the international commerce of the United States create rights under the Lanham Act."  (Doc. No. 151 at 5.)  Put differently, according to Plaintiff, international distribution of films bearing the CINEMAVAULT trademark as far back as 2016 to the present illustrate continuous use in the United States as required by the Lanham Act.  (Id. at 5, 10) (relying on Buti v. Perosa, 135 F.3d 98, 103 (2d Cir. 1998)).

As an initial matter, Plaintiff's contention that international distribution of films bearing the CINEMAVAULT mark creates rights in the United States under the Lanham Act is incorrect. Plaintiff's reliance on Buti is misplaced, considering that the question presented there was "…whether the domestic advertising of an exclusively foreign company's trademark constitutes 'use' of the mark under the Lanham Act…."  Buti, 139 F.3d at 105.  Further, the Buti court answered that question in the negative: "mere advertising or promotion of a mark in the United States is insufficient to constitute 'use' of the mark 'in commerce,' within the meaning of the Lanham Act, where that advertising or promotion is unaccompanied by any actual rendering in the United States…."  (Id.) (emphasis in original).  Moreover, as the United States Supreme Court has made clear, "United States law governs domestically but does not rule the world." Abitron Austria GmbH v. Hetronic Int'l, Inc., 600 U.S. 412, 428 (2023) (quoting Microsoft Corp. v. AT & T Corp., 500 U.S. 437, 454 (2007)).  Thus, claims for Unfair Competition under the Lanham Act are not extraterritorial.  Id. (holding that 15 U.S.C. § 1125(a)(1) is not extraterritorial and "'use in commerce'" of a trademark provides the dividing line between

16

foreign and domestic applications of these provisions.")  It follows, then, that international distribution of films bearing the CINEMAVAULT mark cannot demonstrate continuous use for purposes of establishing ownership rights in the United States under the Lanham Act.

However, there is nonetheless a genuine dispute of material fact as to whether Plaintiff achieved sufficient market penetration to constitute continuous use under the Lanham Act. Defendant insists that Plaintiff has generated negligible revenue in the United States since 2017. (Doc. No. 108 at 18.)  But, in 2021, Plaintiff's revenue was $11,456.61 and in 2022 it was $9,914.26.  (Doc. No. 124 ¶¶ 49, 50.)  Defendant maintains this downward trend evinces a cessation of business on Plaintiff's behalf.  However, Plaintiff's use of the mark need "not [be] extensive [nor] result in deep market penetration or widespread recognition" to demonstrate continuous use.  Maduka, 409 F. Supp. 3d at 356.   Plaintiff maintains that it has continued to do business in the form of (1) receiving royalty payments from films in active distribution in the United States and (2) transitioning to a streaming platform.  Thus, in viewing the facts in the light most favorable to Plaintiff, a reasonable jury may conclude that these business activities show continuous use of the CINEMAVAULT mark.  Moreover, a single sale could suffice to demonstrate ownership of the trademark so long as the sale was "followed by activities which would tend to indicate a continuing effort or intent to continue such use and place the product on the market in a commercial scale."  Maduka, 409 F. Supp. 3d at 356.  Accordingly, reasonable minds may find the receipt of royalties from films in active distribution from as far back as 2016, coupled with Plaintiff's intent to grow the business into the streaming services arena—which was actualized in 2024—sufficient to show continuous use of the CINEMAVAULT mark.

Thus, in viewing the facts in the light most favorable to Plaintiff, a reasonable jury could find that Plaintiff made sufficient continuous use of the CINEMAVAULT to establish ownership.

## 2.  Judicial Estoppel

Next, Defendant argues that Plaintiff is judicially estopped from asserting a claim for likelihood of confusion because Plaintiff's predecessor, Cinemavault.com, successfully argued before the USPTO that there was "no possibility of confusion" between the CINEMAVAULT.COM mark and CINEVAULT mark.  (Doc. No. 108 at 22–23.)  As noted earlier, in 2000 the CINEVAULT mark had been registered to non-party Video Lending of North America, Inc. and resurfaced when Plaintiff's Predecessor sought to register the mark CINEMAVAULT.COM with the USPTO.  (Doc. No. 109  ¶¶ 23–24, Doc. No. 124 ¶¶ 23–24.) Defendant argues that Plaintiff's Predecessor made statements to the USPTO, set forth infra, during that registration process which are attributable to Plaintiff and would judicially estop Plaintiff from now asserting that there is a likelihood of confusion between the marks CINEMAVAULT and CINEVAULT.  (Doc. No. 108 at 22–25.)

The doctrine of judicial estoppel is applicable when "a plaintiff, who has obtained relief from an adversary by asserting and offering proof to support one position, may not be heard later in the same court to contradict himself in an effort to establish against the same adversary a second claim inconsistent with his earlier contention."  Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp., 337 F.3d 314, 319 (3d Cir. 2003) (quoting Scarano v. Central R. Co. of N.J., 2013 F.2d 510, 513 (3d Cir. 1953)). The Third Circuit Court of Appeals has consistently held that the doctrine of judicial estoppel ought "only be applied to avoid a miscarriage of justice." Krystal Cadillac, 227 F.3d at 319 (citing Montrose Medical Group Participating Savings Plan v. Bulger, 243 F.3d 773 (3d Cir. 2001)).  Therefore, judicial estoppel need not be applied to eliminate all inconsistencies.  Krystal Cadillac, 227 F.3d at 319. However, when relevant, there are three requirements to warrant judicial estoppel: (1) the party to be estopped

18

has taken two irreconcilably different positions; (2) the party has "changed his or her position 'in bad faith—i.e., with the intent to play fast and loose with the court"; and (3) judicial estoppel is "'tailored to address the harm identified' and no lesser sanction would adequately remedy the damage done by the litigant's misconduct." Id. (quoting Montrose Medical Group, 243 F.3d at 779–80).

The crux of the dispute between the parties concerning judicial estoppel arises from certain statements made by Plaintiff's Predecessor before the USPTO in 2000.  The disputed statements read at length as follows:

- [T]he marks CINEMAVALUT.COM (and Design) and CINEVAULT are distinct in sight and sound, thus creating distinctive overall impressions of the marks.  While the two marks share the term 'vault', the composition of the terms renders both marks highly distinguishable in both sight and sound.  The marks are phonetically and visually similar only to the extent that they both use the term 'vault'…Applicant's mark is a very long word whereas the cited mark is much shorter.

- The marks also have different meanings. The cited mark [CINEVAULT] is highly suggestive of some sort of house for storing videos, like a video machine or video rental dispenser or for a video store.  Unlike the cited mark, Applicant's mark has no meaning at all when used in connection with the services.  Applicant's services include 'on-line retail store services', 'obtaining copyright clearance rights to motion pictures for television stations, retailers and businesses' and 'distribution of motion pictures'.  Applicant does not 'store' videos in a vault or any housing.  Applicant's mark has no meaning to the consumer or in the industry other than to indicate the origin of the services.  At most, the mark is suggestive of some sort of product or services pertaining to the entertainment industry.

- [T]he goods and services offered in connection with the cited mark CINEVAULT are totally unrelated to the services provided by Applicant.  CINEVAULT is used in connection with 'computerized video rental machines' in Class 09 and 'computerized video rental services' in Class 041.  Applicant is

19

not in the video rental business.  Applicant does not rent videos to consumers.  Instead, Applicant obtains licenses for motion pictures, and distributes motion pictures in the form of videotapes.  Distribution of motion pictures is not remotely related to video rental machines or computerized video rental services.  Rental services and distribution services are totally unrelated.

- [T]he consumers of Applicant's services are not remotely related to the consumers of the cited applicant.  Applicant's consumers are retailers, businesses and television stations whereas the consumers of the cited products/services are limited to consumers wishing to rent, not purchase, a movie for the evening or a video rental store.  Applicant's consumers are not the average individual, like the cited applicant's consumers.  Instead, the consumers are sophisticated businesses that are knowledgeable in the relevant trade or industry and may easily distinguish Applicant's marks from the cited mark.

- [T]he channels of trade differ.  The Applicant's services travel in the motion picture industry, in distributor trade channels, and on-line retail trade channels.  In contrast, the cited mark is used in connection with [video] rental services…A consumer would not be confused about the source of the CINEMAVAULT.COM services because the consumer believes that the Applicant branched out into rental services.  It does not follow that a business that obtains clearances and distributes motion pictures to businesses, retailers and television stations would extend its business to video rental machines and computerized video rental services.

(Doc. No. 124 ¶ 26.)

Defendant contends that Plaintiff is now barred from asserting a likelihood of confusion claim because of the prior statements its predecessor made before the USPTO.  (Doc. No. 108 at 23.)  Specifically, Defendant highlights the attestation that "there is no possibility of confusion [between CINEMAVAULT and CINEVAULT] because, [w]hile the marks share a common term ('vault'), the evidence supporting this one factor in connection with the differences between the marks is insufficient to support a possibility of a likelihood of confusion.  Thus, no likelihood of confusion exists…"  (Doc. No. 108 at 7.)  Defendant also notes that because Cinemavault.com

20

previously argued "CINEMAVAULT and CINEVAULT marks [are] distinguishable in sound and meaning; [CINEMAVAULT's] business-to-business distribution services were 'totally unrelated' to direct-to-consumer video services of the type offered by [Video Lending]; individual consumers utilizing video services like [Video Lending's] were 'not remotely related' to the 'sophisticated business' that were customers of the Cinemavault Group's services and would 'easily distinguish' between the marks; and that the goods and services moved in entirely different channels of trade," Plaintiff cannot now assert that there is any likelihood of confusion between the CINEMAVAULT and CINEVAULT marks.  (Doc. No. 108 at 24.)

Based on the prior attestations of Plaintiff's Predecessor before the USPTO, Defendant argues that each requirement of judicial estoppel is satisfied: (1) Plaintiff's predecessor took a position that is diametrically opposed to, and irreconcilable with, the likelihood of confusion claim at issue now, (2) Plaintiff's "vacillating and self-serving contradictions" evince an intent to play fast and loose with the court, i.e. demonstrate bad faith, and (3) judicial estoppel is tailored to address the harm alleged to have been caused by Plaintiff's inconsistent positions and no lesser remedy would be appropriate given "the elaborate shell game" Plaintiff's principal has engaged in previously.  (Doc. No. 108 at 24–25.)

Conversely, Plaintiff urges "different facts can reconcile different conclusions."  (Doc. No. 123 at 9.)  Plaintiff maintains that the position previously taken before the USPTO is indeed reconcilable with the current likelihood of confusion claim because the nature of Plaintiff's business has changed.  (Doc. No. 123 at 16.)  Specifically, now, Plaintiff's business has expanded beyond sales to other businesses and into the consumer space—including through direct-to-consumer streaming services.  (Id.)  Moreover, Plaintiff avers the statements made before the USPTO twenty-five years ago are likewise reconcilable with Plaintiff's position today because

21

the use of the CINEMAVAULT and CINEVAULT marks would create a likelihood of confusion in view of two entities engaging directly with consumers—particularly in the context of direct-to-consumer streaming.  (Id. at 9, 17.)  Also, the arguments made previously to the USPTO were specific to the differences between an entity that engaged with other businesses, Cinemavault.com, and an entity that engaged directly with consumers, Video Lending.  (Id.)  Thus, Plaintiff is not judicially estopped from asserting a likelihood of confusion claim because the rights implicated in the instant action are not business-to-business, but, rather, business-to-consumer.  (Id.)

Accordingly, here, there is a genuine dispute of material fact as to whether Plaintiff's claim of likelihood of confusion is judicially estopped because of the prior arguments made before the USPTO by Plaintiff's Predecessor, Cinemavault.com.  While Defendant argues that Plaintiff's current position is irreconcilable with the assertions that were made to the USPTO previously, the nature of Plaintiff's Predecessor's business twenty-five years ago appears to be different from the nature of Plaintiff's business today.  Plaintiff maintains that its business has evolved into the consumer space, including, importantly, streaming services directly available to consumers—a space Defendant's business also occupies.  (Doc. No. 123 at 11.)  Therefore, according to Plaintiff, a reasonable jury could find that the evolution of Plaintiff's business from that of a business-to-business entity to one that is consumer facing reconciles Plaintiff's current position with its predecessor's position before the USTPO twenty-five years ago.  For this reason, and looking at the facts in the light most favorable to the non-moving party, a reasonable explanation has been provided by Plaintiff for the differences.

As to the second requirement of judicial estoppel, there is likewise a genuine dispute of material fact as to whether Plaintiff's current position is made in bad faith.  Plaintiff maintains

22

that the remarks made to the USPTO previously highlight the difference in products offered by Plaintiff's Predecessor and Video Lending, the third-party prior applicant.  More specifically, twenty-five years ago Plaintiff's Predecessor provided mainly film distribution services, as opposed to streaming services so prevalent today, whereas Video Lending offered mostly retail, direct-to-consumer products like "consumer operated videocassette dispensing machine[s]…" (Doc. No. 123 at 9.)  Given the exponential growth in technology, streaming services have replaced earlier mediums through which consumers view films.[10]  Technology of the past, very much like the "videocassette dispensing machine" of Video Lending, is now obsolete.[11]  In fact, both Plaintiff and Defendant have highlighted the significance of direct streaming services in the film industry of today.  (See Doc. Nos. 108, 123).  Considering not only the evolution of technology over the past twenty-five years, but also the evolution in Plaintiff's business, it appears that Plaintiff's change in position is not in bad faith. Instead, Plaintiff's position is predicated on the rapidly changing film industry.  A reasonable jury could conclude that the differences between the services offered by Plaintiff now—particularly its direct-to-consumer streaming service—have had to change over time to remain competitive.  Thus, in viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that Plaintiff's claim of a likelihood of confusion is not made in bad faith because Plaintiff and Defendant now both provide streaming services directly to consumers.

---

[10]    See Doc. No. 123 at 11 ("In recent years, as part of the evolution of the entertainment business, from the theater and cable distribution of a quarter century ago, to today's largely direct to consumer market, both [Plaintiff and Defendant] moved, [sic] to implement direct to consumer feature film streaming services.")

[11]    Id.

Finally, Defendant insists no lesser sanction than judicially estopping Plaintiff from asserting a likelihood of confusion claim is appropriate because Plaintiff's principal, Nick Stiliadis, has engaged in "elaborate shell game[s]" previously and could subsequently take inconsistent positions again in the future.  (See Doc. No. 108 at 25.)

Even if, for argument's sake, Stiliadis has engaged in "elaborate shell game[s]" previously, a reasonable jury could nonetheless find that a lesser sanction than judicial estoppel is warranted. It is worth noting that "[j]udicial estoppel is [but] one arrow in the quiver of sanctions at a court's disposal."  Klein v. Stahl GMBH & Co. Maschinefabrik, 185 F.3d 98, 109 (3d Cir. 1999). Moreover, judicial estoppel is only appropriate when the [Federal Rules of Civil Procedure] would fail to redress litigants' conduct.  Id.  When considering all the facts presented here— particularly the evolution of the film industry and the changes Plaintiff has made to its business to remain competitive—a reasonable jury could conclude that a lesser sanction under the Rules is appropriate, as opposed to the harsher remedy of judicial estoppel.

Thus, when viewing the facts in the light most favorable to Plaintiff, a reasonable jury could find that Plaintiff is not judicially estopped from asserting a likelihood of confusion claim under the Lanham Act.

### 3.  Likelihood of Confusion under the Lapp Factors

Finally, Defendant asserts that, even if Plaintiff is not judicially estopped from asserting a likelihood of confusion claim, summary judgment is appropriate because there is no likelihood of confusion between the CINEMAVAULT and CINEVAULT marks. (Doc. No. 108 at 25.)

Claims for likelihood of confusion in trademark infringement cases filed in district courts in the Third Circuit are evaluated by using the ten Lapp factors: "(1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market." Interspace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983).  Critically, none of the ten Lapp factors—on their own— are dispositive.  Id.

Additionally, the Lapp factor test is qualitative, not quantitative.  A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 214–15 (3d Cir. 2000).  Thus, courts need not employ every factor—as the Lapp factors are "meant to be tools, not hurdles."  Id. at 214. In their respective memoranda, neither Plaintiff nor Defendant address every one of the ten Lapp factors, only the ones they deem relevant here.  (See Doc. Nos. 108, 123).  Thus, the Court will focus its analysis on the germane Lapp factors discussed by both Plaintiff and Defendant.

### a.  Degree of Similarity

Though none of the Lapp factors, on their own, are dispositive, when products are in direct competition with one another, the similarity of the marks "may be the most important of the ten factors in Lapp."  Checkpoint Sys., Inc. v. Check Point Software Techs., Inc., 269 F.3d 270, 281 (3d Cir. 2001) (quoting Fisons Horticulture, Inc. v. Vigoro Indus., 30 F.3d 466, 477 (3d. Cir. 1994)).  "Unless the allegedly infringing mark…is substantially similar to the protectable

25

mark…, it is highly unlikely that consumers will confuse the product sources represented by the different marks."  Id. (quoting Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd., 50 F.3d 189, 202 (3d Cir. 1995)).  Thus, "if the overall impression created by the marks is essentially the same, 'it is very probable that the marks are confusingly similar.'"  Id. (quoting Opticians Ass'n of America v. Indep. Opticians of America, 920 F.2d 187, 195 (3d Cir. 1990)).  In considering the similarity of the marks and the likelihood of confusion, courts "move into the mind of the consumer" and compare the "appearance, sound, and meaning of the mark" to determine if the average consumer would likely confuse the two marks.  (Id.)

Here, Defendant maintains that its mark is "eminently distinguishable" from Plaintiff's. (Doc. No. 108 at 29.)  Moreover, Defendant asserts that its direct-to-consumer FAST streaming channel service bears no "relevant similarities" to Plaintiff's "prior role as sales agent in the trade of acquiring and selling film distribution rights from and to sophisticated business entities…" (Id. at 30.)  Defendant highlights that prior to the present litigation, there was no evidence that Plaintiff's business competed in any way with Defendant's.  (Id.)

Plaintiff, however, argues to the contrary.  Instead, Plaintiff maintains that because Plaintiff and Defendant are in direct competition with one another, the similarity of their respective marks weighs significantly in Plaintiff's favor.  More specifically, Plaintiff avers "[t]he company groups of Plaintiff and Defendant are similar to each other.  They have been in many of the same businesses, and, in fact, have been doing business with each other for many years….[B]oth have been involved in the production of feature films, the distribution of film rights, and various activities delivering their films and the films of others to the public."  (Doc. No. 123 at 11.)  Notably, Plaintiff highlights that both Defendant and Plaintiff offer direct-to-consumer feature film streaming services.  (Id.)

The arguments of both Parties illustrate that there is a genuine dispute of material fact as to the similarity between Plaintiff's and Defendant's respective marks.  For one, both marks, CINEVAULT and CINEMAVAULT, have striking similarities. Both use the word "vault," and, despite Plaintiff's mark bearing the two additional letters "ma" in "cinema," they may at times sound alike. Moreover, a reasonable jury could conclude the marks, included below for illustrative purposes, look alike because of similarities of the words employed in both marks, and the dark backgrounds with light lettering.



(Doc. No. 124 ¶ 13.)



(Doc. No. 124 ¶ 62.)

### b.  Strength of Owner's Mark

Defendant contends that Plaintiff's CINEMAVAULT mark is weak, which weighs strongly against a likelihood of confusion.  (Doc. No. 108 at 25.)

It is worth noting that a strong trademark is "one that carries widespread, immediate recognition that one producer (even if unknown) is associated with the mark, and so with the product.  Checkpoint Sys., 269 F.3d at 282 (quoting Versa Prods., 50 F.3d at 203)).  The overall

strength of a mark is determined by (1) the distinctiveness or conceptual strength of the mark and (2) its commercial strength or recognition in the marketplace. Id. The first prong considers the inherent features of the mark, whereas the second considers "factual evidence of 'marketplace recognition.'" Harrison Rsch. Laboratories, Inc. v. Hcramerica, LLC, No. 09-cv-6326, 2012 WL 12897887, at *5 (D.N.J. Nov. 9, 2012) (citing Fisons Horticulture, Inc., 30 F.3d at 479).

### i. Distinctiveness or Conceptual Strength

Under distinctiveness, courts look at the inherent features of a mark. Checkpoint Sys., Inc., 269 F.3d at 282. Under the Lanham Act, trademark protection is extended to four categories of marks:

> 1) arbitrary or fanciful marks [that] use terms that neither describe nor suggest anything about the product; they bear "no logical or suggestive relation to the actual characteristics of the goods." 2) Suggestive marks [that] require consumer "imagination, thought or perception" to determine what the product is. 3) Descriptive terms [that] "forthwith convey [] an immediate idea of the ingredients, qualities, or characteristics of the goods" [and] 4) generic marks…that "function as the common descriptive name of a product class."

Id. (quoting A&H Sportswear, 237 F.3d at 221–22). Moreover, descriptive marks with a demonstrated secondary meaning are entitled to trademark protection. Id. A descriptive mark with a demonstrated secondary meaning is one that "is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products of services." Id. at n.10. Generally, a secondary meaning is established via "extensive advertising which creates in the minds of consumers an association between the mark and the provider of the services advertised under the mark." Id.

As to the distinctiveness prong, Defendant concedes CINEMAVAULT is a descriptive mark but nonetheless argues it is conceptually weak. (Doc. No. 108 at 26.) Defendant notes that

28

the descriptive terms "cinema" and "vault," when combined, do not bolster the strength of the CINEMAVAULT mark because "when two or more descriptive terms are combined, the determination of whether the composite marks also has descriptive significance turns on whether the combination of terms evokes a new and unique commercial expression…." (Id.) (quoting Trademark Manual of Examining Procedure § 1209.03(d) (May 2025)).  Defendant further contends that the constituent terms "CINEMA" and "VAULT" retain their descriptive significance "as reflected in the natural pronunciation of the mark and logo treatment, which stacks CINEMA and VAULT."  (Id.)  Defendant also asserts that the CINEMAVAULT mark is further weakened by third-party use.  (Id. at 27) (citing Taj Mahal Enterprises, Ltd. v. Trump, 745 F. Supp. 240, 248 (D.N.J. 1990) ("[T]he widespread use of a given mark by others weakens the mark and dilutes the plaintiff's protections."); R.J. Ants, Inc v. Marinelli Enters., 771 F. Supp. 2d 475, 494 (E.D. Pa. 2011) ("[E]vidence of third party use of a plaintiff's mark is indicative of the mark's lack of commercial strength in the marketplace and conceptual commonality."). [12]

In contrast, Plaintiff notes that its use of the CINEMAVAULT mark for nearly twenty-five years "has established [the] Cinemavault trademark in the minds of the general public, both for its own productions and for its library of productions of others…."  (Doc. No. 123 at 23.)

Here, reasonable minds could reach different conclusions as to whether Plaintiff's mark is so conceptually weak as to not warrant trademark protection.  While Defendant correctly notes that third-party use weakens a mark, a reasonable jury could nonetheless be persuaded by Plaintiff's argument that the general viewing public has been exposed to the CINEMAVAULT mark for nearly a quarter of a century and thus associates Plaintiff with the services that are

---

[12]  To demonstrate widespread third-party use, Defendant highlights numerous users on Youtube.com that employ the name CINEMAVAULT or "names or marks virtually identical thereto."  (Doc. No. 108 at 27); (see also Doc. No. 111-6, Ex. PP.)

purportedly provided under the mark: namely, a platform from which movies are stored and then provided to would-be viewers.

### ii.  Commercial Strength or Recognition in the Marketplace

With respect to the second prong of the strength of an owner's mark, a court evaluates commercial strength by looking to "factual evidence of marketplace recognition." Harrison Rsch. Laboratories, 2012 WL 12897887, at *5.  This includes "money expended on advertising, trends in purchases and other indicators of recognition by consumers." Id. (quoting R.J. Ants, Inc., 771 F. Supp. 2d at 493–94; 800-JR Cigar, Inc. v. GoTo.com, Inc., 437 F. Supp. 2d 273, 288 (D.N.J. 2006)).

Defendant maintains that CINEMAVAULT is commercially weak because Plaintiff has "incurred negligible advertising expenses and generated de minimis revenue from 2016 to the present."  (Doc. No. 123 at 27.)  Defendant also stresses that Plaintiff has neither advertised nor earned any revenue in the streaming market in which Defendant conducts business.  (Id. at 28.) To illustrate these points, Defendant submits Plaintiff's streaming service has "approximately [fourteen] users and '$100' in revenue…."  (Id.)  Defendant further argues that because Plaintiff has failed to conduct any surveys measuring consumer recognition of the CINEMAVAULT mark, it further evinces the commercial weakness of the mark.  (Id.) (citing GOLO, LLC v. Goli Nutrition Inc., No. 20-cv-667, 2020 WL 5203601, at *6 (D. Del. Sept. 1, 2020) (noting that direct evidence of consumer recognition includes customer surveys)).

Plaintiff, on the other hand, argues Defendant's understanding of whether a mark is commercially strong is misguided.  (Doc. No. 123 at 21.)  Specifically, Plaintiff notes "Defendant['s] argu[ment], [is] effectively, that if a business is not continually growing, or at least maintaining a current level of sales, it is out of business and loses its trademark rights.  This

is obviously unsupportable." (Id.)  Instead, Plaintiff maintains that it was conducting business via royalty collection from sub-distributors and "reporting its obligations to rights holders who had entrusted their films to Plaintiff." (Id.)  Moreover, Plaintiff submits that its trademark has been exposed to millions of consumers in hundreds of feature films and so the movie-going public is aware of Plaintiff and the CINEMAVAULT mark, thus evincing the commercial strength of its mark.  (Doc. No. 123 at 16.)

Here, the absence of consumer surveys demonstrating customer recognition is not dispositive when there is other evidence to support the commercial strength of a mark.  See Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc., 921 F.2d 467, 476 (3d Cir. 1990) ("While consumer surveys are useful, and indeed the most direct method of demonstrating secondary meaning and likelihood of confusion, they are not essential where, as here, other evidence exists.").  Although Plaintiff has not produced a single consumer survey demonstrating recognition of the CINEMAVAULT mark, it does argue, as just noted, that the movie-going public is aware of Plaintiff and the CINEMAVAULT mark.  Despite this claim, its references to "millions of consumers [being] exposed to the CINEMAVAULT mark" are vague, bordering on being conclusory.  Moreover, as Defendant's point out, there are only fourteen users of Plaintiff's streaming service and Plaintiff has only earned $100 in revenue from the same service.  These allegations may be potent arrows in Defendant's quiver of defenses asserting commercial weakness.

While at this stage of the litigation the commercial strength of the CINEMAVAULT mark does not appear to be the strongest of marks, this factor is only one in a multifactor analysis, and, this factor, on its own, is not dispositive on Defendant's Motion for Summary Judgment.  In any

31

event, it does provide some support to Plaintiff's argument about the recognition of its mark when viewing the facts in the light most favorable to Plaintiff.

### c.  Evidence of Actual Confusion

Although evidence of actual confusion may prove highly probative, such evidence is not required to prove a likelihood of confusion claim.  Checkpoint Sys., 269 F.3d at 291.  This is because finding evidence of actual confusion may be difficult as instances of actual confusion often go unreported.  Id.  Moreover, "[i]f a defendant's product has been sold for an appreciable period of time without evidence of actual confusion, one can infer that continued marketing will not lead to consumer confusion in the future."  Id. (quoting Versa Prods., 50 F.3d at 205).   Put differently, the longer a product has been on the market, the stronger the inference will be.  Id.

Defendant submits that it has used the CINEVAULT mark for more than four years without any instances of confusion.  (Doc. No. 108 at 34.)  Moreover, Defendant highlights that while Plaintiff's principal, Nick Stiliadis, testified at his deposition that certain unnamed individuals expressed confusion between CINEVAULT and CINEMAVAULT at recent foreign film festivals, the principal could not identify a single person by name.  (Id. at 35.)  And, in any event, the purported confusion cannot give rise to a showing of actual confusion because it was attended by industry professionals.  (Id.) (citing Taj Mahal, 745 F. Supp. at 249).

Conversely, Plaintiff asserts that actual confusion has already occurred, as experienced by Stiliadis.  (Doc. No. 123 at 5.)  To demonstrate actual confusion, Plaintiff points to the deposition of Stiliadis, who, when deposed, testified that numerous people, including his son, a music producer, whom Stiliadis described as "an internet guy," approached him to inform Stiliadis that they had confused Defendant's streaming platform with Plaintiff's based on the similarity of the marks.  (Doc. No. 125, Ex. 21 at 278–81.)  More specifically, Stiliadis testified that his son told

him the CINEVALUT mark "looks just like your company [CINEMAVAULT]" and that "[Defendant] [is] ripping you off." (Id. at 281.)  Stiliadis went on to state that following the exchange with his son, "about three months later, a bunch of other people came and told me the same thing." (Id. at 282.)

While from an evidentiary standpoint, the instances of actual confusion submitted by Plaintiff appear to be thin, the Court cannot conclude as a matter of law that there is no genuine dispute of material fact as to whether there have been actual instances of confusion between Plaintiff's and Defendant's respective marks.  While a jury might find the statements made by Stiliadis's son indicating confusion between the marks self-serving, however, the Court cannot make a credibility determination at the summary judgment stage.  Moreover, the statements of Stiliadis's son, coupled with the alleged numerous other instances of people approaching Stiliadis conveying the same sentiment, could nonetheless persuade a jury that there have been legitimate instances of actual confusion between the CINEMAVAULT and CINEVAULT marks.

### d. Whether the Parties' Goods are Manufactured through the Same Channels of Trade

Courts recognize that "the greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion." Checkpoint Sys., 269 F.3d at 288–89 (quoting Acxiom Corp. v. Axiom, Inc., 27 F. Supp. 478, 502 (D. Del. 1998)).  Thus, in evaluating this factor, courts must consider "trade exhibitions, publications[,] and other media the parties use in their marketing products as well as the manner in which the parties use their sales forces to sell their products to consumers." Id. at 289.  Notably, this is a fact intensive inquiry. Id.

Defendant asserts that because there is no evidence Defendant's customers have any awareness of Plaintiff or the CINEMAVAULT mark, their respective products clearly do not move through the same channels of trade. (Doc. No. 108 at 33.)  Defendant highlights that it

33

markets the CINEVAULT FAST channels to individual consumers, whereas Plaintiff's target audience is primarily comprised of businesses, with only a small amount of consumers using its streaming service. (Id.) Thus, according to Defendant, there is no overlap between the CINEMAVAULT and CINEVAULT marks in trade channels because Defendant and Plaintiff, respectively, target different audiences, Cinevault targeting consumers and Cinemavault targeting businesses. (Id.)

Plaintiff, on the other hand, submits that its trademark has been exposed to millions of consumers in hundreds of feature films and thus the movie-going public is aware of Plaintiff and the CINEMAVAULT mark. (Doc. No. 123 at 16.) Plaintiff highlights that hundreds of films bearing the CINEMAVAULT mark in their opening credit frames have been seen by the viewing public. (Id. at 11.) Moreover, in the Supplemental Memorandum in Opposition, Plaintiff notes that "all films provided to sub-distributors by [Plaintiff] had the CINEMAVAULT trademark on the head of the film, DVDs, advertising, and so forth," providing further evidence that the CINEMAVAULT mark has been distributed in the consumer market. (Doc. No. 151 at 3.)

Here, there is a genuine dispute of material fact as to whether Plaintiff's and Defendant's respective marks move in the same channels of trade. Defendant insists there is no possibility of overlap because none of its consumers have any awareness of Plaintiff or Plaintiff's business and this illustrates that Plaintiff's target audience is comprised of businesses—not individual consumers, arguing that the number of consumers is demonstrably small. However, Plaintiff maintains that its mark has been exposed to the general viewing public, including individual consumers, through opening credits in films, on DVDs, and advertising. Plaintiff also has a streaming service. Thus, a reasonable jury could conclude that Plaintiff's and Defendant's marks do travel in the same channel of trade—namely, directly to consumers—by virtue of the fact that

Plaintiff's mark has appeared on products targeted to individual consumers, like DVDs and opening film credits.

In weighing the Lapp factors at issue in the present action and drawing all reasonable inferences in favor of Plaintiff, as the Court must do at the summary judgment stage, there is a sufficient factual basis to create a genuine dispute of material fact to defeat Defendant's claim that there is no likelihood of confusion under the Lanham Act.

## V.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. No. 107) will be denied.  An appropriate Order follows.